Approved: _____
MICHAEL FERRARA/ADAM FEE/MICHAEL D. LOCKARD
Assistant U.S. Attorneys

U.S. DISTRICT COURT
FILED
JUN 0 9 2014

ORIGINAL

DOC # 1

14 MAG 1286

Before:   HON. SARAH NETBURN
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :

          - v. -                    :

PIRZADA KHAWAJA ABDUL WAHAB         :
     CHISHTI,
     a/k/a "Abdul Wahab Chishti :
          Pirzada Khawaja,"
     a/k/a "Angel," and             :
ALI DANISH,
     a/k/a "Danish Ali,"            :

                                    :
          Defendants.               :

- - - - - - - - - - - - - - - - - - x

**SEALED COMPLAINT**

Violation of 21 U.S.C.
§§ 959(c) & 963

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

          KIMOJHA BROOKS, being duly sworn, deposes and says
that he is a Special Agent with the U.S. Drug Enforcement
Administration ("DEA") and charges as follows:

                    COUNT ONE

          1.    From at least in or about February 2014, up to
and including in or about June 2014, PIRZADA KHAWAJA ABDUL WAHAB
CHISHTI, a/k/a "Abdul Wahab Chishti Pirzada Khawaja," a/k/a
"Angel," and ALI DANISH, a/k/a "Danish Ali," the defendants, who
will first enter the United States in the Southern District of
New York, and others known and unknown, intentionally and
knowingly did combine, conspire, confederate, and agree together

and with each other to violate the narcotics laws of the United States.

2.   It was a part and an object of the conspiracy that PIRZADA KHAWAJA ABDUL WAHAB CHISHTI, a/k/a "Abdul Wahab Chishti Pirzada Khawaja," a/k/a "Angel," and ALI DANISH, a/k/a "Danish Ali," the defendants, and others known and unknown, would and did import into the United States from a place outside thereof a controlled substance, in violation of Title 21, United States Code, Sections 812, 952(a), and 960(a)(1).

3.   It was further a part and an object of the conspiracy that PIRZADA KHAWAJA ABDUL WAHAB CHISHTI, a/k/a "Abdul Wahab Chishti Pirzada Khawaja," a/k/a "Angel," and ALI DANISH, a/k/a "Danish Ali," the defendants, and others known and unknown, would and did distribute a controlled substance, intending and knowing that such substance would be imported into the United States from a place outside thereof and into waters within a distances of 12 miles of the coast of the United States, in violation of Title 21, United States Code, Sections 812, 959(a), 959(c), and 960(a)(3).

4.   The controlled substance involved in the offense was one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 960(b)(1)(A).

OVERT ACTS

5.   In furtherance of the conspiracy, and to effect the illegal objects thereof, the following overt acts, among others, were committed:

a.   On or about April 23, 2014, PIRZADA KHAWAJA ABDUL WAHAB CHISHTI, a/k/a "Abdul Wahab Chishti Pirzada Khawaja," a/k/a "Angel," the defendant, met with others in Barcelona, Spain, including a co-conspirator not named as a defendant herein ("CC-1"), to arrange for the sale and delivery of a one-kilogram sample of heroin to a confidential source.

            b.    On or about May 16, 2014, ALI DANISH, a/k/a
"Danish Ali," the defendant, spoke by phone with another co-
conspirator not named as a defendant herein ("CC-2") and a
confidential source to discuss the exchange of cocaine for
heroin and the sale of missiles to the confidential source.

        (Title 21, United States Code, Sections 959(c) and 963.)

            The bases for my knowledge and for the foregoing
charge are, in part, as follows:

            6.    I am currently employed as a DEA Special Agent
and have participated in the investigation of this case.  This
Affidavit is based upon my personal knowledge, my review of
documents and other evidence, and my conversations with other
law enforcement officers and other people.  Because this
Affidavit is being submitted for the limited purpose of
establishing probable cause, it does not include all the facts
that I have learned during the course of my investigation.
Where the contents of documents and the actions and statements
of others are reported herein, they are reported in substance
and in part, except where otherwise indicated.

            7.    I have learned the following from another DEA
Special Agent ("Agent-1") who personally reviewed recordings of
conversations involving PIRZADA KHAWAJA ABDUL WAHAB CHISHTI,
a/k/a "Abdul Wahab Chishti Pirzada Khawaja," a/k/a "Angel," the
defendant, three confidential sources ("CS-1," "CS-2," "CS-3,"
and, collectively, the "CSs"),[1] and others, and who has
personally spoken to both CS-1, CS-2, and CS-3 about CHISHTI and
ALI DANISH, a/k/a "Danish Ali," the defendant:

            a.    On or about February 27, 2014, in Barcelona,
Spain, CHISHTI met with the CSs and others to discuss the CSs'
purchase of heroin.  During that conversation, CHISHTI said that
he and his associates were interested only in a cash

---

[1] CS-1, CS-2 and CS-3 are paid DEA informants.  The CSs'
information has proven to be reliable, and has been corroborated
by independent evidence, including the recorded conversations
and phone conversations described below.

transaction.  CS-2 then said that the best heroin came from
Pakistan and CHISHTI agreed.

            b.  Also during the February 27 meeting in
Barcelona, CS-2 said that CS-2 did not have a heroin supplier in
Pakistan.  CHISHTI told CS-2 that CHISHTI would speak to
CHISHTI's brother, who knew heroin suppliers in that area, but
that CS-2 should also make inquiries when CS-2 traveled to
Dubai.  CHISHTI assured CS-2 that CHISHTI's brother would be
able to provide CS-2 with a contact once CS-2 was in Dubai,
because CHISHTI's brother knew people who trafficked heroin from
Afghanistan.

            c.  On or about April 23, 2014, in Barcelona,
Spain, CHISHTI met with CS-1 and others.  CHISHTI told CS-1
that, if CS-1 wanted to be involved in the "business" at a high-
level, CS-1 would have to purchase large amounts of heroin.
CHISHTI told CS-1 that CS-1 could not buy two, five, 10, or 12
kilograms of heroin from the heroin suppliers with whom CHISHTI
and CS-1 were meeting.  CHISHTI said that those suppliers
trafficked larger quantities and would expect more significant
heroin deals, such as CS-1 buying an entire shipping container
worth of heroin.

            d.  Also during the April 23 meeting in
Barcelona CC-1 told CS-1, in front of CHISHTI, that in the event
the heroin was seized by law enforcement, no one would be
responsible for payment because the shipment was essentially a
gamble for all involved.  However, CC-1 said that CS-1 would
have to show some proof that the heroin had been seized.  If CS-
1 did so, another shipment of heroin would be sent.

            e.  Also during the April 23 meeting in
Barcelona, CC-1 told CS-1, in front of CHISHTI, that CC-1's
heroin was of very high quality.  CHISHTI explained to CS-1
that, after CS-1 received the heroin, CS-1 should thoroughly cut
the heroin to make four kilograms of diluted heroin out of every
one kilogram of heroin actually sent.  CS-1 then told CHISHTI
that CS-1 planned to ship the heroin to the Dominican Republic,
at which point others would traffic the heroin to New York via
Puerto Rico.  Thereafter, CS-1 told CHISHTI that CS-1 would pay

CHISHTI $35,000 for a one-kilogram sample of heroin.  CHISHTI
responded that he (CHISHTI) could not bring the heroin to his
office or otherwise handle it, but would use a middle-man to
deliver the heroin and receive the $35,000 payment.  CHISHTI
told CS-1 that if, after testing the one-kilogram sample, CS-1
was satisfied that the heroin was pure Afghan heroin, CS-1
should tell CHISHTI that CS-1 wanted to buy a larger amount.

   f. Subsequently, on or about April 28, 2014,
the CSs traveled to Dubai, United Arab Emirates, to meet with
CC-1 and CC-2.  CC-1 identified CC-2 as their "boss," and an
individual with connections to weapons and drug traffickers, as
well as powerful criminal organizations operating in Asia and
Europe.

   g. During the April 28 meeting in Dubai, CC-2
introduced the CSs to DANISH.  CC-2 identified DANISH as a
weapons trafficker who obtained weapons from Russian suppliers
and provided them to CC-2's criminal associates.

   h. Also during the April 28 meeting in Dubai,
CS-3 stated that the CSs wanted to purchase "Iglas" -- which
Agent-1 knows, based on his training and experience, to be the
name of a Russian-made surface-to-air missile -- and that the
CSs were purchasing the missiles on behalf of the CSs' drug
bosses in Colombia.  CS-3 also stated that the purpose of
purchasing the missiles was so that the CSs' purported drug-
trafficking organization could use them in Colombia to protect
their cocaine production and distribution business.

   i. In response to a question from CS-3 about
where the missiles could be delivered to the CSs, DANISH said
that a smaller quantity of missiles (three to five missiles)
could be delivered directly to wherever they (the CSs) needed
them.  DANISH also said that, if the CSs wanted to purchase a
larger quantity of missiles, they would be delivered to the CSs'
drug bosses in Colombia by having a "legitimate" weapons
customer place an order for the missiles, and by then having the
missiles diverted to the CSs while having empty arms boxes sent
to the legitimate customer.

j.    Also during the April 28 meeting in Dubai, CS-1 and CC-2 discussed, in the presence of DANISH and others, the CSs' purported Colombian drug-trafficking organization's interest in providing to CC-2 and his associates large quantities of cocaine in exchange for large quantities of Afghan heroin, which heroin would eventually be transported through the Caribbean and, ultimately, to the United States.

8.    Based on his review of transcripts and audio recordings of electronic and phone communications involving the CSs, Agent-1 has also informed me that, following the meeting in Dubai, certain of the CSs maintained phone contact with ALI DANISH, a/k/a "Danish Ali," the defendant, which recorded communications, included the following:

a.    On or about May 12, 2014, CS-3 spoke with DANISH by phone.  During the call, CS-3 and DANISH discussed the proposed terms of the sale of the missiles to the CSs' organization.  DANISH stated that he could provide a minimum of two and a maximum of five missiles to the CSs as a sample of DANISH's weapons supply, and that the missiles could be delivered to one of two potential locations in Eastern Europe.

b.    Also on the May 12 call with DANISH, DANISH stated that rather than money ("green"), his interests are in that country where CS-3 and CS-1 "belong" and what CS-3 can "show" DANISH from CS-3's "side," which CS-3 understood, based on his work in this investigation, as a reference to cocaine from Colombia.  DANISH also told CS-3 that CC-1 would be forwarding to CS-3 the bank account information for DANISH's payment for the missiles; following the May 12 call, CC-1 forwarded to CS-3 bank account information for DANISH.

c.    Subsequently, on or about May 16, 2014, CS-1 spoke with DANISH and CC-2 by telephone.  During the call, CC-2 stated that "they" were still good to proceed with the sale of a one-kilogram sample of heroin to the CSs, and would then go forward with the larger cocaine-for-heroin exchange in Africa.

d.    Also during the May 16 call, DANISH and CC-2 discussed ensuring that the CSs' bosses in Colombia -- who would

6

be supplying the cocaine -- were pleased with the course of the negotiations.

          e.    Also during the May 16 call, DANISH and CS-1 discussed going forward with the transaction they previously had discussed, which CS-1 understood to be a reference to DANISH's sale of missiles to the CSs for delivery to the CSs' purported drug-trafficking bosses in Colombia.

          9.    I have also learned from Agent-1 that, on or about May 20, 2014, in Amsterdam, the Netherlands, CC-1 and others not named as defendants herein delivered one kilogram of heroin to undercover officers ("UCs") posing as criminal associates of the CSs -- which Agent-1 believes, based on his knowledge of this investigation and his training and experience -- was the "sample" of heroin discussed by PIRZADA KHAWAJA ABDUL WAHAB CHISHTI, a/k/a "Abdul Wahab Chishti Pirzada Khawaja," a/k/a "Angel," the defendant, as described above in paragraph 7(e).  The UCs took a small portion of heroin from the kilogram and returned the remainder of the heroin to CC-1's associates.  The sample taken by the UCs subsequently tested positive for heroin.

          WHEREFORE, I respectfully request that warrants be issued for the arrests of PIRZADA KHAWAJA ABDUL WAHAB CHISHTI, a/k/a "Abdul Wahab Chishti Pirzada Khawaja," a/k/a "Angel," and

DANISH ALI, a/k/a "Ali Danish," the defendants, and that they be arrested and imprisoned or bailed, as the case may be.


_____

KIMOJHA BROOKS
Special Agent
U.S. Drug Enforcement Administration

Sworn to before me this
9th day of June 2014.


_____

HON. SARAH NETBURN
United States Magistrate Judge
Southern District of New York